## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **KRYSTAL M. ANDERSON,** and all others similarly situated, | ) ) ) |
| **Plaintiffs,** | ) ) |
| vs. | ) ) |
| **PRINCIPAL LIFE INSURANCE COMPANY; BENEFITS PLANS ADMINISTRATIVE COMMITTEE; BENEFITS PLANS INVESTMENT COMMITTEE,** | ) ) ) ) ) ) |
| **Defendants.** | ) ) |

**CIVIL ACTION NO:**

## CLASS ACTION COMPLAINT

Plaintiff Krystal M. Anderson individually and as a representative of a class of similarly situated persons, brings this action on behalf of current and former participants in the Principal Select Savings Plan for Employees ("Plan") and the Principal Select Savings Plan For Individual Field ("Field Plan") (the Plan and the Field Plan are collectively referred to as the "Plans" and the investment line-ups are virtually identical) against the Principal Life Insurance Company ("Principal"); the Benefit Plans Administrative Committee and the Principal managers who were its members (collectively "Administrative Committee"); the Benefit Plans Investment Committee and the Principal managers who were its members (collectively "Investment Committee") ("Plan Committees" means the Administrative Committee and the Investment Committee) (collectively, "Defendants.").

## NATURE OF THE ACTION

1.      The Plans have had over $1 billion in assets since 2005. Billion dollar plans pay an average investment management fee of 25 basis points and median total plan fees of 30 basis points. (A basis point is .0001 and is the industry standard unit for measuring fees.) The Plans paid substantially more than this.

2.      The Plan Committees decide what fees the Plans will pay and to whom. The Chief Executive Officer of Principal appoints the Plan Committee members. The people on the Plan Committees are Principal managers who answer to the CEO. Principal pays the salaries and bonuses of the Plan Committee members. The Plan Committee Members are not independent of Principal. The Plan Committees ensured that all the investments and vendors for the Plans were Principal affiliates.

3.      Principal affiliates act as the primary investment advisor for the pooled separate accounts in which the Plans invests. Principal affiliates charge a high investment advisor fee for that service. But Principal's affiliate hire subadvisors to do the essential work of portfolio management.

1

Principal does, however, keep much of the investment management fees. The Plans could go straight to the subadvisor for the same service, cutting out Principal as a middleman, and pay less than what they pay now for the same service with millions of dollars of annual saving.

4.      The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, requires Defendants to act solely in the interest of the Plans' participants when making decisions about selecting, removing, replacing, and monitoring the Plans' investments and vendors. ERISA also requires Defendants to minimize the Plans' expenses. Rather than fulfilling these fiduciary duties, described as "the "highest known to the law,"[1] by offering Anderson and other participants in the Plans investment options and plan administration services at reasonable cost, Principal and its managers on the Plan Committees chose and maintained for the Plans Principal investment products and plan administrative services with high fees.

5.      The Defendants chose and maintained Principal investment products and plan administration services because Principal, its subsidiaries, and its officers benefited financially from the fees.

6.      Defendants also breached their fiduciary duties by causing the Plans to maintain a vendor relationship with Principal for administrative services whereby the Plans paid, directly or indirectly, higher than reasonable fees to Principal for such services.

7.      This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, 409, 502(a)(2), 29 U.S.C. §§ 1104, 1106, 1109, 1132(a)(2). Plaintiff Anderson brings this action on behalf of the Plans for losses to the Plans and for disgorgement of unlawful fees, expenses, and profits taken by Defendants for the benefit of Principal and themselves.

---

[1] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quotations omitted).

8.      This class action is brought on behalf of participants and their beneficiaries in the Plans who participated in either of the Plans from August 8, 2008 through April 17, 2015 ("Class Period").

## JURISDICTION AND VENUE

9.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants' principal place of business is located in this district.

## PARTIES

I.      **Plaintiff**

12.      **Plaintiff Krystal M. Anderson ("Anderson").** Plaintiff Anderson is a resident of Pleasonton, California. Anderson participated in the Plan during the Class Period and invested in funds established and managed by Principal through her account in the Plan during the Class Period.

II.      **Defendants**

13.      **Principal Life Insurance Company ("Principal").** Principal is a life insurance, retirement plan recordkeeping, and investment services company, and a subsidiary of Principal Financial Group ("Principal Financial"). Principal is a fiduciary for the Plans because it established and administers the pooled separate accounts in which the Plans invest. Principal is located in Des Moines, Iowa. Principal, through its Chief Executive Officer, is a fiduciary within the meaning of ERISA, and thus subject to high fiduciary standards because it appoints, monitors, and removes the members of the Plan Committees, which run the Plans as described below.

14. **Benefits Plan Administrative Committee ("Administrative Committee").** The Administrative Committee is responsible for administering the Plans and is the named fiduciary for that purpose. The Administrative Committee is a fiduciary of the Plans under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plans. The Administrative Committee was responsible for selecting administrative service-providers to the Plans and thus had discretionary authority or discretionary responsibility in the administration of the Plans and the disposition of its assets in the form of fees paid to such service-providers. The members of the Administrative Committee are appointed by the Chief Executive Officer of Principal. All the members of the Administrative Committee are officers or managers at Principal or of one of its affiliates.

15. **Benefits Plan Investment Committee ("Investment Committee").** The Investment Committee is responsible for investing and protecting the Plans' assets and is the named fiduciary for those purposes. The Investment Committee is a fiduciary of the Plans under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plans and the disposition of the Plans' assets. The members of the Investment Committee are appointed by the Chief Executive Officer of Principal. All the members of the Investment Committee are officers or managers at Principal or of one of its affiliates.

**FACTS**

I.      **The Plans.**

16.     The Plans are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

17.     The Plans are "defined contribution plans" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

18.     The Plans cover eligible employees of Principal and its subsidiaries and affiliates.

4

19.     The Plans had 15,026 total participants and beneficiaries as of December 31, 2014.

20.     The Plans had total assets valued at approximately $2.02 billion as of December 31, 2014.

21.     The Investment Committee was responsible for selecting, evaluating, monitoring, and maintaining the Plans' investment options.

22.     The Administrative Committee or the Investment Committee was responsible for selecting, evaluating, monitoring, and maintaining the Plans' administrative service-providers.

23.     During the Class Period, the Plans invested in the following funds: Principal Bond & Mortgage Separate Account, Principal Government & High Quality Bond Separate Account, Principal International Emerging Markets Separate Account, Principal Diversified International Separate Account, Principal LargeCap S&P 500 Index Separate Account, Principal LargeCap Blend I Separate Account, Principal LargeCap Growth Separate Account, Principal LargeCap Value Separate Account, Principal MidCap Blend Separate Account, Principal Money Market Separate Account, Principal MidCap Growth III Separate Account, Principal U.S. Property Separate Account, Principal SmallCap S&P 600 Index Separate Account, Principal LargeCap Growth I Separate Account, Principal LargeCap Value III Separate Account, Principal SmallCap Growth I Separate Account, Principal SmallCap Growth II Separate Account, Principal SmallCap Value III Separate Account, Principal Lifetime 2010 Separate Account, Principal Lifetime 2020 Separate Account, Principal Lifetime 2030 Separate Account, Principal Lifetime 2040 Separate Account, Principal Lifetime 2050 Separate Account, Principal Lifetime Strategic Income Separate Account, Principal SmallCap Value II Separate Account, Principal Inflation Protection Separate Account, Principal Equity Income Separate Account and Principal Select Savings Stable Value Fund, Principal Financial Group Inc. Stock Separate Account ("Principal Stock Fund"). Except for the Principal Stock Fund, which invested in Principal Financial common stock, all of these are pooled investment funds established

5

and marketed by Principal. Principal charged investment management and other fees to these funds. The funds other than the Principal Stock Fund are collectively referred to as "Principal investment options."

## II.   The Plans invested one hundred percent of its assets in Principal investment options.

24.   Not counting the Principal Stock Fund, the Plans invested exclusively in Principal investment options during the Class Period.

25.   There are many non-Principal-branded, reasonably priced and well-managed investment options in the 401(k) plan marketplace available to the Plans. Such options include registered mutual funds, exchange-traded funds, non-registered commingled funds such as bank collective or common trusts and insurance company pooled separate accounts, and separately-managed single client funds.

26.   No one investment management firm is good at everything. Some investment management firms excel at fixed income investment products, others at equity investment products, and still others at international and emerging market products. Fiduciaries for large plans understand this and accordingly take a "best of breed" approach in assembling menus of retirement plan investment options for their retirement plan investors, carefully and diligently searching among the various vendors in the retirement plan investment product market to construct a suitable and appropriately low-cost and diversified array of investment options.[2]

---

[2] *See* Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*, (Feb. 2012) at 2. Russell Investments is a retirement plan consultant and investment manager. Its clients include Aetna, Inc., AT&T, Inc., Barclays Bank, Caterpillar, Chrysler Group LLC, Coca-Cola Bottling Co., Delta Airlines, Inc., and Toyota Motor Pension Fund, among others. http://www.russell.com/US/about_russell/default.asp (last viewed July 23, 2014).

27.     Thus, only 10% of 401(k) plans restrict their investment options to those from a single investment management firm.[3] Here, Defendants offered participants in the Plans as their retirement investment options **only** Principal investment options. Fiduciaries of the Plans knew or should have known that no single investment management firm provides best-of-class investment fund offerings across in all asset classes.

28.     In a recent study, only 12% of retirement plans report a plan investment option menu consisting of 76%-100% investment funds that are affiliated with the particular retirement plan's recordkeeping.[4] The number of plans with a 100% proprietary line-up is even less. The Plans are among the few with a 100% line-up of investment options affiliated with the recordkeeper.

### III.     The Plans pay higher fees to Principal than is typical of peer mega plans.

29.     Institutional investors, including mega plans, that is, retirement plans with assets over $1 billion such as the Plans, have substantial bargaining power in the market for retirement plan investment products. It aggregates its assets under management when it bargains with portfolio managers over the fees for managing its commingled funds (mutual funds and pooled separate accounts) that it offers to the investing public.

30.     A prudent and loyal fiduciary for a mega-plan uses the bargaining power of the plan to negotiate low fees from investment managers.[5]

---

[3] *See* Deloitte Consulting LLC, Annual 401(k) Benchmarking Survey (2011) at 49, Figure 7.2 ("401(k) Survey").

[4] *See* 401(k) Survey at 49, Figure 7.3.

[5] *See Just Out of Reish: Class-ifying Mutual Funds*, http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537 (last viewed July 23, 2014) ("The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of

31.     The Plans have had over $1 billion in assets since 2005. Defendants should have considered whether the Plans' investments and fee arrangements remained suitable for plans of such size and whether they should leverage the Plans' substantial bargaining power to enter into new arrangements for investment options and other services to the Plans.

32.     Mega defined contribution plans commonly pay a weighted average total investment management fee of 25 basis points.[6] The Plans paid a weighted average investment management fee significantly higher than 25 basis points in 2012. Had the Plans paid a weighted average investment management fee of 25 basis points a year during the Class Period, it would have saved approximately $15 million in investment management fees alone.

33.     Mega plans also pay comparatively low total fees. According to a recent report by the Investment Company Institute ("ICI"), the trade association for the mutual fund industry, and BrightScope, a firm that provides fee benchmarking and other analyses of and for 401(k) plans, plans with more than $1 billion in assets average *total* plan costs of 33 basis points, with a median of 30 basis points.[7] The Plans, however, paid total investment management above 33 basis points.

34.     Mega plans also tend to disfavor bundled service provider products, that is, where a single service provider provides investment, administration, recordkeeping, and other services as part of a bundled set of services because bundled service arrangements tend to have higher fee structures.

---

the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.")

[6] Plansponsor, Plansponsor's 2011 DC Survey: Points of Hue.

[7] BrightScope and Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, at 40-42 ("401(k) Report") (available at www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.)

35.     According to one survey, "smaller plans are more likely to pursue a bundled approach, while larger plans opt for a fixed-dollar per head approach … plans with a fixed-dollar per head fee model have lower reported recordkeeping, and trust and custody fees than the bundled plans."[8]

36.     For example, according to the 2014 NEPC Survey, 61% of plans that use fixed dollar arrangements have over $1 billion in assets.[9]

37.     The Plans use Principal for all services under a bundled service arrangement.

**IV.     In the marketplace, Principal's products are used almost exclusively by small plans, not billion dollar clients like the Plans.**

38.     A retirement plan database identified 4,467 defined contribution plans with plan assets greater than zero listing Principal as a service-provider as of 2012.

39.     3,092 of the those plans, just over 69%, had less than $10 million in total plan assets.

40.     4,216 of those plans, just over 94%, had less than $50 million in plan assets.

41.     4,394 of those plans, just over 98%, had less than $250 million in total plan assets.

42.     The 401(k) Report finds that insurance companies provide recordkeeping services for about half of plans with under $10 million in assets, but only for 7.9% of plans with assets over $1 billion. *Id.* at 35. Plans under $10 million pay much higher fees than plans over $1 billion.

43.     The Plans have more than $2 billion in assets. Yet, the Defendants caused the Plans to use Principal products and services that are more commonly used by small retirement plans. Defendants failed to leverage the bargaining power of the Plans to reduce investment management and other fees charged by Principal and Principal affiliates to the Plans.

---

[8] NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors are Doing Now, at 2 ("2014 NEPC Survey").

[9] NEPC Survey at 2.

**V.      Principal charged the Plan unreasonable investment management fees.**

44.      The Plans invest or invested in 27 pooled separate accounts during the Class Period, *i.e.*, the Principal investment options. A pooled separate account is a commingled investment fund with an investment strategy generally matching its name.

45.      Some of the Principal investment options hold a portfolio of securities directly. Other Principal investment options simply invest in an underlying mutual fund established and marketed by Principal affiliates ("Principal Mutual Fund(s)"). Various investment management, administrative, and other fees are charged to the Principal investment options and Principal Mutual Funds.

**a.   The Plans paid Principal unreasonable investment advisor fees.**

46.      Every Principal Fund in the Plans has an "investment advisor" and one or more "subadvisors." Some of these arrangements occur at the separate account level for those Principal investment options that hold securities directly and some at the level of the underlying Principal Mutual Fund where the Principal Fund simply invests in such a mutual fund.

47.      For example, the Bond & Mortgage Separate Account identifies Principal Management Corporation ("PMC") as the Advisor and Principal Global Investors, LLC ("PGI") as the subadvisor. The portfolio managers of each Principal Fund are employed by the subadvisor. Thus, in each case, the core service of a given Principal Fund, portfolio management, is provided by the subadvisor, not the advisor. In other words, the subadvisor makes the decisions about which securities to buy, sell, or hold. These arrangements for the Plans' investments are illustrated below in Table 1.

TABLE 1

| Principal Fund | Advisor | Subadvisor[10] |
|---|---|---|
| Principal Small Cap Value II | PMC | DFA/Vaughan/LA Cap |
| Principal Bond & Mortgage | PMC | PGI |
| Principal Diversified International | PMC | PGI |
| Principal Equity Income | PMC | Edge Asset Mgmt. |
| Principal Gov't and High Quality Bond | PMC | Edge Asset Mgmt. |
| Principal Inflation Protection | PMC | BlackRock |
| Principal Int'l Emerging Markets | PMC | PGI |
| Principal Large Cap Growth | PMC | Columbus Circle |
| Principal LargeCap Growth I | PMC | T. Rowe Price / Brown |
| Principal LargeCap Value | PMC | PGI |
| Principal MidCap | PMC | PGI |
| Principal MidCap Growth III | PMC | Baird/Blair |
| Principal Small Cap Growth I | PMC | AB/CCI/Brown |
| Principal LargeCap S&P 500 Index | PMC | PGI |
| Principal SmallCap S&P 600 Index | PMC | PGI |

48.     As explained below, every one of the subadvisors for the Principal investment

options (or underlying Principal Mutual Fund as the case may be) offers portfolio management

services directly to institutional investors as a separately-managed account (not to be confused with a

pooled separate account, which is a commingled fund offered by an insurance company multiple

investors), that is, a single client account. This means that the Plans, or more precisely the Plans'

---

[10] In addition to PGI, the subadvisors are Dimensional Fund Advisors ("DFA"), Vaughan Nelson Investment Management ("Vaughan"), Los Angeles Capital Management ("LA Cap"), Edge Asset Management, Inc. ("Edge Asset Mgmt"), Blackrock, Inc. ("Blackrock"), Columbus Circle Investors ("Columbus Circle" or "CCI"), T. Rowe Price ("T. Rowe Price"), Brown Advisory, Inc. ("Brown"), Robert W. Baird & Co., Inc. ("Baird"), William Blair ("Blair"), and Alliance Bernstein Investments ("AB")

fiduciaries could negotiate directly with the subadvisor to a given Principal Fund held by the Plans rather than paying Principal affiliate PMC. But the Investment Committee did not do so.

49.     Asset managers generally offer their services to an array of clients. Asset managers often serve as subadvisors to a mutual fund or other pooled investment fund established by a third party such as PMC, which may or may not be affiliated with the subadvisor, and receive a subadvisory fee for managing the portfolio. The third party, in this case PMC, establishes, brands, administers, and markets the fund, but does not manage the portfolio. The asset manager also may have clients that contract with it directly for the same investment management service, such as large institutional investors that prefer a separately-managed account, thereby cutting out the middle man and its additional fees. Although asset managers provide the same core portfolio management service, such as managing a large cap growth fund, to many different clients, the asset manager generally manages all of its clients' investments under a common investment strategy as one large portfolio, using accounting entries to separate the portfolio into "silos" or "sleeves" for each particular client type (mutual funds, collective trusts, separately-managed accounts, etc.)

50.     For example, according to a Statement of Additional Information ("SAI") (March 1, 2010), published by Principal, the Principal LargeCap Growth Fund I is sub-advised by Brown Advisory Incorporated, with the individual portfolio manager identified as Kenneth M. Stuzin. The SAI reveals that Mr. Stuzin has one registered investment company client with a $77 million stake in his LargeCap Growth Fund I portfolio, likely Principal's mutual fund bearing that name. It also reveals that Stuzin has two other pooled fund clients with a combined stake of $80 million. The remainder of his 541 accounts, with a total stake of $1.6 billion in the LargeCap Growth Fund I portfolio are almost certainly single clients, that is, separately-managed accounts. In other words, an institutional client such as a large retirement plan could go directly to Mr. Stuzin to obtain his portfolio management service, cutting out the middle-man who established and markets the pooled

12

funds. In fact, the vast majority of Stuzin's accounts in this fund—99%—are not pooled funds but other accounts such as institutional investors who had the good sense to cut out the middle-man.

51.    The average account balance for the "other" accounts managed by Stuzin is $2.957 million. Thus, Stuzin will manage a single client separate account with an investment minimum somewhere below $3 million in his LargeCap Growth I portfolio. One of the Plans had $18.6 million in the LargeCap Growth Fund I in 2010.

52.    The Plans could have invested with Stuzin directly, rather than through a Principal Fund. Given the Plan's large investment in this portfolio, the Plans' fiduciaries could and should have negotiated among the most favorable fee terms with Stuzin for a separately-managed account. Indeed, given Principal's sizable investment in Stuzin's portfolio via Principal's registered mutual fund and other pooled funds, Principal could have obtained for its Plans the most favorable terms offered by Stuzin as part of a package deal by aggregating all of Principal's assets under management.

53.    Stuzin's fee for sub-advising the Principal LargeCap Growth Fund I is 22 basis points. Defendants could have negotiated directly with Stuzin on behalf of the Plans for the same portfolio management service and obtained it at the same price, or even lower, via aggregation.

54.    Instead, Defendants chose to use Stuzin's portfolio management service through an investment in the Principal LargeCap Growth I Separate Account, which in turn invested in a Principal Mutual Fund of the same name (ticker PLGIX). The investment management fee for the underlying mutual fund is 61 basis points. The advisor for the mutual fund is PMC, a Principal affiliate. PMC collects the difference between the 22 basis points charged by Stuzin and the 61 basis points charged for investment management. But PMC does not manage any investments. Stuzin manages the portfolio. This 39 basis point gap, 64% of the management fee, went to Principal, but provided no value to the Plan.

55. In sum, the Plan paid 39 additional basis points a year by using a Principal mutual fund instead of going directly to the portfolio manager.

56. The Securities and Exchange Commission requires professional investment advisors to file a Form ADV annually, which contains information about the investment styles, assets under management, key officers of the firm, fees, and other information.

57. According to Principal's Form ADV, each subadvisor used by PMC (except J.P. Morgan and Neuberger Berman Fixed Income, LLC) has agreed that assets of any existing registered investment company sponsored by Principal to which the subadvisor provides investment advisory services and which have the same investment mandate as the fund for which the fee is being calculated will be combined to aggregate assets for purposes of obtaining best pricing. In other words, Principal can aggregate all its assets under management for purposes of obtaining the best pricing from the subadvisors.

58. Subadvisors would readily have agreed to include the Plans in the aggregated assets to acquire and keep Principal's business. Thus, the Plans could have obtained the best fee terms available to Principal had Defendants used the Plans' assets and bargaining power to the Plans' advantage. Defendants chose not to do so.

59. The same retained investment management fee is present in all of the pooled separate accounts in which the Plans invested, as listed below in Table 2 (based on 2012 data). Every subadvisor to these Principal investment options or underlying Principal Mutual Funds offers its portfolio management service as a separately-managed account:

14

TABLE 2

| Principal Fund | PMC Management Fee BP | Sub-Adv Fee BP | PMC Retained Management Fee BP | PMC Percent of Mgmt Fee Retained |
|---|---|---|---|---|
| Principal Small Cap Value II | 110 | 38 | 72 | 66% |
| Principal Bond & Mortgage | 30 | 10 | 20 | 67% |
| Principal Diversified Intl | 69 | 9 | 60 | 87% |
| Principal Equity Income | 52 | 7 | 45 | 86% |
| Principal Gov't and High Quality Bond | 45 | 10 | 35 | 78% |
| Principal Inflation Protection | 45 | 8 | 37 | 82% |
| Principal Intl Emerging Markets | 69 | 49 | 20 | 30% |
| Principal Large Cap Growth | 35 | 17 | 18 | 52% |
| Principal LargeCap Growth I | 61 | 22 | 39 | 64% |
| Principal LargeCap Value | 45 | 7 | 38 | 85% |
| Principal MidCap | 45 | 10 | 35 | 78% |
| Principal MidCap Growth III | 95 | 38 | 57 | 60% |
| Principal Small Cap Growth I | 102 | 44 | 58 | 57% |
| Principal LargeCap S&P 500 Index | 6 | 1 | 5 | 76% |
| Principal SmallCap S&P 600 Index | 6 | 2 | 4 | 65% |

60.     The weighted-average fee for the Plans' investments in the above-listed funds, taking into account the amount invested in each fund, is 44 basis points. The weighted average subadvisor fee is 15 basis points, a difference of 29 basis points. Thus, on an asset-weighted basis, the Plans paid almost three times what it would have paid had it purchased the portfolio services of the subadvisors to the Principal Fund directly.

61.     One of the Plans invested  $896,582,510 in these Principal investment options in 2012.

62.     The additional asset-weighted investment management fee paid by one of the Plans was over $2.6 million in 2012 alone, only one year of the Class Period. Extrapolating to past years and from the end of 2012 to the present, that Plan paid approximately $10-15 million in additional

15

investment management fees to Principal in connection with these pooled separate accounts during the Class Period.

63.     Defendants knew the Plans could have contracted directly with the subadvisors to the Principal investment options. Principal negotiates with the subadvisors over their fee; Principal knows the investment break points and fee schedules; and several of the subadvisors including Edge, Morley, and PGI are Principal affiliates. Thus Defendants knew that the investment services they maintained for the Plans were available at a much lower cost.

      **b.  The Plans paid additional and unreasonable investment managment fees for those separate accounts that invested in mutual funds.**

64.     Twelve of the Principal investment options invest or invested in underlying Principal Mutual Funds. They are the Principal Equity Income Separate Account ("Equity Income"), Principal Inflation Protection Separate Account ("Inflation Protection"), Principal LargeCap Growth I Separate Account ("LargeCap Growth I"), Principal MidCap Growth III Separate Account ("MidCap Growth III"), Principal SmallCap Growth I Separate Account ("SmallCap Growth I"), Principal SmallCap Value II Separate Account ("SmallCap Value II"), Principal Lifetime Strategic Income Separate Account ("Strategic Income"), Principal Lifetime 2010 Separate Account ("Lifetime 2010"), Principal Lifetime 2020 Separate Account ("Lifetime 2020"), Principal Lifetime 2030 Separate Account ("Lifetime 2030"), Principal Lifetime 2040 Separate Account ("Lifetime 2040"), Principal Lifetime 2050 Separate Account ("Lifetime 2050").

65.     Principal charges an investment management fee to Principal investment options. This investment management fee is in addition to the investment advisor and subadvisor fees charged to the Principal Mutual Funds in which these 12 Principal investment options invest. But Principal does not actually manage any assets in the 12 Principal investment options that simply hold

Principal Mutual Funds. The portfolio management is performed by the subadvisor to the

underlying mutual fund. These arrangements set forth in Table 4 below.

TABLE 4

| SEPARATE ACCOUNT | 2013 PLAN ASSETS | 2013 FEE | BASIS POINTS |
|---|---|---|---|
| Equity Income | $57,631,567.74 | $95,631.88 | 17 |
| Inflation Protection | $10,320,707.07 | $36,861.09 | 36 |
| LargeCap Growth I | $4,498,137.62 | $8,290.71 | 18 |
| MidCap Growth III | $47,405,092.05 | $122,093.75 | 26 |
| SmallCap Growth I | $56,326,573.30 | $105,601.96 | 19 |
| SmallCap Value II | $24,012,847.70 | $56,880.93 | 24 |
| Strategic Income | $9,219,179.10 | $27,651.43 | 30 |
| Lifetime 2010 | $12,028,017.74 | $34,818.38 | 29 |
| Lifetime 2020 | $60,037,844.00 | $167,685.24 | 28 |
| Lifetime 2030 | $87,549,253.67 | $244,971.86 | 28 |
| Lifetime 2040 | $71,459,823.92 | $197,517.22 | 28 |
| Lifetime 2050 | $48,447,776.82 | $122,762.80 | 25 |

66.     The additional investment management fees paid by one of one of the plans Plans in

2013 to Principal in connection with the 12 Principal investment options listed in Table 4 totaled

approximately $1.22 million. Extrapolating to past years and from the end of 2013 to the present,

the Plan paid approximately $7-10 million in additional investment management fees to Principal in

connection with these pooled separate accounts during the Class Period.

**VI.     Red flags during the Class Period should have caused Defendants to evaluate
whether Principal funds were suitable investments for the Plans.**

67.     Principal maintains a due diligence team that evaluates subadvisors for its pooled

funds quarterly based on investment guidelines when each subadvisor is hired. The monitoring

process involves quantitative and qualitative assessments. According to Principal, the most common

and important form of quantitative assessment is the periodic review of historical investment

performance. Qualitative assessments involve measuring the level of active management risk,

style/sector consistency, up market/down market performance, and attribution analysis for sources of value-added.

68.    Based on the subadvisor's quantitative or qualitative score, Principal may place the subadvisor on its internal watch list, which reflects a cautionary status that triggers a more focused and in-depth review of the investment manager. Principal may also place a subadvisor on probationary status, which is only removed once the subadvisor scores high enough on the quantitative scoring criteria. Any subadvisor placed on the watch list or probationary status may be removed by Principal at any time.

69.    The Principal Small Cap Value II Separate Account is sub-advised by Dimensional Fund Advisors, Vaughan Nelson Investment Management, and Los Angeles Capital. Defendants added the separate account to the Plans in 2009. The separate account's subadvisors were placed on Principal's watch list in March 2009 for quantitative reasons—in the very same year the fund was added to the Plans.

70.    The Principal Equity Income and Government and High Quality Bond Separate Accounts are sub-advised by Edge Asset Management. In September 2008, Principal informed its clients that the separate account, then sub-advised by Principal Global Advisors, was placed in its watch list. In April 2009, Edge Asset Management took over portfolio management responsibilities, and the investment remained on the watch list. Edge Asset Management remained on probation status until at least mid-2011.

71.    In April 2009, Principal placed its Strategic Asset Management separate accounts managed by Edge Asset Management on its watch list for qualitative reasons related to the departure of two portfolio managers.

72.    The Principal Inflation Protection separate account is sub-advised by Blackrock Financial Management. In June 2008, Principal informed its clients that the separate account, then

sub-advised by Principal Global Advisors, was placed on its watch list for quantitative reasons. In December 2008, Blackrock Financial Management took over portfolio management responsibilities. The separate account remained on probation status until at least mid-2011.

73.     The Principal Large Cap Growth and Small Cap Growth I separate accounts are sub-advised by Columbus Circle Investors. Defendants added the Small Cap Growth I separate account to the Plans in 2010. In March 2011, Principal informed its clients that the Large Cap Growth separate account, then sub-advised by Columbus Circle Investors, was placed on its watch list for quantitative reasons related to its underperformance.

74.     The Principal Large Cap Growth I separate account is sub-advised by T. Rowe Price and Brown Advisory. In September 2008, Principal informed its clients that the separate account, then sub-advised by T. Rowe Price and Brown Advisory, was placed on its watch list for quantitative reasons related to its underperformance.

75.     The Principal Mid Cap Growth III separate account is sub-advised by Baird and William Blair. Since 2008, the Mid Cap Growth III separate account has maintained a "two star" (out of five stars) Morningstar Star Rating relative to 635 peer group investment options.

76.     The Principal Small Cap Growth I separate account is sub-advised by Alliance Bernstein Investments, Columbus Circle Investors, Brown Advisory, and Emerald Advisors. In June 2009, Principal informed its clients that the separate account, then sub-advised by Principal Global Advisors, was placed in its watch list for quantitative reasons. In June 2011, one of Principal Global Advisors' portfolio managers departed, and due to this change, Principal placed the separate account on probation status.

77.     An article published on the 401khelpcenter.com website authored by Donald Stone, Accredited Independent Fiduciary,[11] states that ERISA fiduciaries should consider several criteria when evaluating funds. Among other things, plan should avoid comprising more than 5% of the assets in any given fund.

78.     The Plans comprised over 5% of the assets of the Principal Government & High Quality Bond Separate Account in 2012.

79.     The Plans comprised over 6% of the assets of the Principal MidCap Blend Separate Account in 2012.

80.     The Plans comprised over 6% of the assets of the Principal LargeCap Growth Separate Account in 2012.

81.     The Plans comprised over 7% of the assets of the Principal International Emerging Market Separate Account in both 2011 and 2012.

82.     Despite the foregoing warning signs within the Class Period, Defendants caused the Plans to remain invested in Principal investment options.

**VII.   Defendants selected four new funds for the Plans during the Class Period.**

83.     Since the beginning of the Class Period, Defendants added four new investment funds to the Plans. Each fund was a Principal Fund: Principal SmallCap Growth Fund I, Principal Inflation Protected Bond, Principal Equity Income, and Principal Select Stable Value Fund.

84.     The fact that the Investment Committee only chose Principal investment options when adding new funds is evidence that the Investment Committee did not exercise the prudence and skill of a diligent fiduciary.

---

[11] *See* http://www.401khelpcenter.com/401k/stone_investment_selection.html#.US8HZaWlLjJ (last viewed on July 23, 2014).

85.     The Plans have comprised over 7% of the assets of the Principal SmallCap Growth I Separate Account since the Plans began investing in the fund in 2010.

86.     The Plans comprised over 8.42% of the assets of the Principal Inflation Protected Separate Account in 2012—only two years after the Plans first invested in the fund in 2010.

87.     In 2012, Defendants selected the newly-minted Principal Select Savings Stable Value Fund ("Stable Value Fund").

88.     Defendants violated their fiduciary duties and engaged in a prohibited transactions by causing the Plans to invest in new Principal investment options.

## VIII.   Defendants caused the Plans to forego revenue-sharing rebates.

89.     Principal also serves as the recordkeeper to the Plans.

90.     Recordkeepers like Principal generally allow retirement plans for which they provide recordkeeping services to invest in funds established and managed by the recordkeeper as well as funds established and managed by other, unaffiliated companies.

91.     Recordkeepers generally offer their client plans the choice between a "closed architecture" arrangement, which means the plan only invests in funds established and managed by the recordkeeper or one of its affiliates, and an "open architecture" arrangement, which allows the plan to invest in funds established and managed by companies unaffiliated with the recordkeeper.

92.     Plans that adopt a closed architecture arrangement generally receive very favorable terms with respect to investment management, recordkeeping, and administrative fees because they have agreed to give one provider all their business.

93.     It is common under both closed and open architecture arrangements for an advisor to a mutual fund in which a plan invests to pay to the recordkeeper a share of its investment advisory fee, hence the term "revenue-sharing," to defray plan administration fees and expenses that would otherwise be charged directly to the plan.

21

94.     The amount of revenue-sharing paid to a recordkeeper by an advisor to a mutual fund depends on several factors. Advisors to actively-managed funds generally pay more revenue-sharing than index funds. Many index fund advisors pay little or no revenue-sharing at all. Equity fund advisors generally pay more revenue-sharing than bond fund advisors. And closed-architecture arrangements often result in the highest level of revenue-sharing because the service provider is capturing all of the plan's business and receiving all of its fees.

95.     In Principal's case the revenue-sharing payments are roughly as follows: its index funds generally pay 39 basis points; equity funds pay approximately 65 basis points;  international funds pay 79 basis points; and target date funds pay 60-65 basis points. When Principal is the recordkeeper, as it is for the Plans, all that money stays with Principal.

96.     When a plan uses Principal as its recordkeeper and invests in a Principal Fund, a percentage of the amount earned by the investment advisor to the fund, Principal, is transferred to the recordkeeper, again Principal, to defray recordkeeping and administrative expenses that would otherwise be paid directly by the plan.

97.     Because the amount of revenue shared is based on a percentage of a plan's investment in given mutual funds, the revenue-sharing payments received by the recordkeeper increase as assets in the given funds increase. A fiduciary should seek to recapture revenue-sharing for its plan when revenue-sharing payments exceed the reasonable value of recordkeeping services.

98.     When revenue-sharing payments exceed the market rate for the value of recordkeeping services, a fiduciary is obligated to seek rebates to the plan for the excess amount.

99.     A plan fiduciary, in fulfilling its fiduciary duties to a plan, must consider how a plan's size can be leveraged to reduce recordkeeping costs.

100.     Thus, very large plans, similar in size to the Plans at issue here, often negotiate revenue-sharing recapture agreements. Under such agreements, the recordkeeper and the plan's

fiduciaries agree to cap recordkeeping and administrative fees at a fixed amount, usually a per-participant dollar amount. To the extent that revenue-sharing payments to the recordkeeper exceed the capped amount, the difference is rebated to the plan.

101.    The Plans have the ability to obtain among the most favorable revenue-sharing recapture arrangements in the market for several reasons. First, the Plans are very large defined contribution plans, with combined assets of approximately $2 billion as of 2014. Plans this size will typically generate millions of dollars in revenue-sharing payments annually. Second, the Plans are in a closed-architecture arrangement, meaning that all the Plans' investments are Principal investment options and Principal collects all the fees, giving Principal great incentive to provide favorable revenue-sharing recapture to the Plans to obtain and keep its business. Third, the Plans are heavily concentrated in actively managed funds, which generate high fees for the fund advisor and correspondingly high levels of revenue-sharing. As of the end of 2012, not counting Principal stock, 81% of the Plans' assets were invested in Principal actively managed funds.

102.    Based on Principal's typical revenue-sharing arrangements and the amount the Plans invested in Principal investment options, the Principal investment advisors to the funds in which the Plan invested, under ordinary circumstances with an unaffiliated plan, would have paid millions in revenue-sharing payments during the Class Period to Principal.

103.    The Plans had 15,026 participants at the end of 2014. Given the Plans' closed architecture and the weighting of the Plans' investments in actively-managed funds, especially equities, in a typical arm's length arrangement PMC, the advisor to the Principal investment options in the Plans, would have paid an estimated $2.8 million in revenue-sharing payments to the recordkeeper, which is too much for plans of this size.

104.    The charges for recordkeeping services, especially for mega defined contribution plans, have declined since 2008.

105.    Had the Plans entered into an arms' length relationship with Principal pursuant to an agreement negotiated by a prudent and unconflicted fiduciary, the Plans would have paid a per-participant fee annually substantially lower than they did.

106.    For the entire Class Period, the Plans should have paid, at most, approximately $780,000 in recordkeeping fees to Principal—far less than the Plans' investments generated in revenue-sharing payments during the Class Period.

107.    The Form 5500 reveals that Principal received both direct and indirect compensation from the Plans for providing recordkeeping services to the Plans. The amount of indirect compensation is not disclosed in the Form 5500.

108.    The Administrative and/or Investment Committee breached their fiduciary duties by failing to negotiate for revenue-sharing recapture.

**ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS**

109.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)    For the exclusive purpose of
>
> > (i)    Providing benefits to participants and their beneficiaries; and
> >
> > (ii)    Defraying reasonable expenses of administering the plan;
>
> (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)    By diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)     In accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

110.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

111.     Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties."[12] As the Department of Labor explains,

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available

---

[12] *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.[13]

112.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . . .[14]

113.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.[15]

114.     The Department of Labor counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

---

[13] DoL Ad. Op. No. 88-16A.

[14] DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

[15] DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.[16]

In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.[17]

---

[16] *Meeting Your Fiduciary Responsibilities* (May 2004) (available at http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html) (last viewed July 23, 2014).

[17] *Understanding Retirement Plan Fees and Expenses* (May 2004) (available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.)

115.    ERISA prohibits certain transactions with plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA § 406 provides as follows:

> (a) Transactions between plan and party in interest
>
> Except as provided in section 1108 of this title:
>
>> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>>
>>> (A) Sale or exchange, or leasing, of any property between the plan and a party in interest;
>>>
>>> (B) Lending of money or other extension of credit between the plan and a party in interest;
>>>
>>> (C) Furnishing of goods, services, or facilities between the plan and a party in interest;
>>>
>>> (D) Transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>>>
>>> (E) Acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.
>>
>> (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.
>
> (b) Transactions between plan and fiduciary.
>
>> A fiduciary with respect to a plan shall not—
>>
>> (1) Deal with the assets of the plan in his own interest or for his own account,
>>
>> (2) In his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

28

(3) Receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## CLASS ALLEGATIONS

116.   Anderson brings this action on behalf of a class defined as:

> All participants in the Principal Select Savings Plan for Employees and all participants in the Principal Select Savings Plan For Individual Field from August 8, 2008 to April 17, 2015. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

117.   Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

118.   The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The Plans had over 10,000 participants and beneficiaries in every year of the Class Period, all of whom invested in at least one of the Principal investment options during the Relevant Time Period and all of whom suffered from the excessive fees charged by Principal. The number of class members is so large that joinder of all its members is impracticable.

119.   Common questions of law and fact include:

A.   Whether Defendants caused the Plans to offer and maintain Principal investment options established or managed by Principal or its subsidiaries and affiliates;

B.   Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plans and services for the Plans;

C.   Whether Defendants breached their fiduciary duties to the Plans by causing the Plans to invest its assets in Principal investment options;

D. Whether Defendants breached their fiduciary duties to the Plans by causing the Plans to pay, directly or indirectly, excessive recordkeeping and plan administration fees to Principal and its affiliates and subsidiaries;

E. Whether the investment and service-provider decisions made by Defendants were solely in the interests of participants of the Plans and beneficiaries of the Plans;

F. Whether Defendants breached their fiduciary duty by failing to defray reasonable expenses of the Plans;

G. Whether Defendants engaged in prohibited transactions in selecting new investments for the Plans within the Class Period;

H. Whether the Plans suffered losses as a result of Defendants' fiduciary breaches.

120.    Anderson's claims are typical of the claims of the Class. He has no interests that are antagonistic to the claims of the Class. During the Class Period, Anderson invested in Principal investment options through his account in the Plan. Anderson understands that this matter cannot be settled without the Court's approval. Anderson is not aware of another suit pending against Defendants arising from the same circumstances.

121.    Anderson will fairly and adequately protect the interests of the Class. He is committed to the vigorous representation of the Class. Anderson's counsel are experienced in class action and ERISA litigation.

122.    A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover,

Defendants, as fiduciaries of the Plans, were obligated to treat all Class members similarly as participants of the Plans pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Anderson is unaware of any difficulty in the management of this action as a class action.

123.     This Class may be certified under Rule 23(b).

A.     23(b)(1). As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.     23(b)(2). This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

C.     23(b)(3). This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## CLAIMS FOR RELIEF

## COUNT I

### Breaches of Duty in Maintaining the Plans' Investments

124.    Anderson repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.    Defendants are bound by ERISA's duties of undivided loyalty and defraying the Plans' expenses.

126.    Defendants violated each of these duties with respect to the following Principal products:  Principal Bond & Mortgage Separate Account, Principal Government & High Quality Bond Separate Account, Principal International Emerging Markets Separate Account, Principal Diversified International Separate Account, Principal LargeCap S&P 500 Index Separate Account, Principal LargeCap Blend I Separate Account, Principal LargeCap Growth Separate Account, Principal LargeCap Value Separate Account, Principal MidCap Blend Separate Account, Principal MidCap Growth III Separate Account, Principal SmallCap S&P 600 Index Separate Account, Principal LargeCap Growth I Separate Account, Principal LargeCap Value III Separate Account, Principal SmallCap Growth I Separate Account, Principal SmallCap Growth II Separate Account, Principal SmallCap Value III Separate Account, Principal Lifetime 2010 Separate Account, Principal Lifetime 2020 Separate Account, Principal Lifetime 2030 Separate Account, Principal Lifetime 2040 Separate Account, Principal Lifetime 2050 Separate Account, Principal Lifetime Strategic Income Separate Account, Principal SmallCap Value II Separate Account, Principal Inflation Protection Separate Account, Principal Equity Income Separate Account and Principal Select Savings Stable Value Fund.

127.     Defendants violated their duties by maintaining the Plans' investments in Principal investment options when they knew or should have known that the core investment manager services were available from the same subadvisors at much lower cost.

128.     Had Defendants acted acted exclusively for the purpose of defraying the Plans' expenses, and solely in the interests of the Plans, instead of acting in Principal's interests, the Plans would have saved millions of dollars in fees during the Class Period.

129.     Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1).

130.     As a direct and proximate result of these breaches, the Plans and class members lost millions of dollars in the form of additional fees.

131.     Pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), the Defendants are liable to disgorge all fees received from the Plans, directly or indirectly, and profits thereon, and restore all losses suffered by the Plans caused by their breaches of the duty of loyalty.

## COUNT II

### Breaches of Duty in Selecting the Plans' Investments

132.     Anderson repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.     Defendants are bound by ERISA's duties of undivided loyalty, prudent management of the Plans' assets, and defraying Plan expenses.

134.     Defendants violated each of these duties with respect to the following Principal products:  Principal SmallCap Growth I Separate Account, Principal SmallCap Value II Separate Account, Principal Inflation Protection Separate Account, Principal Equity Income Separate Account and Principal Select Savings Stable Value Fund.

33

135.     They violated these duties by selecting these Principal investment options, and only Principal investment options, when they added new investments to the Plans during the Class Period.

136.     Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1).

137.     As a direct and proximate result of these breaches, the Plans and class members lost millions of dollars in the form of additonal fees.

138.     Pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), the Defendants are liable to disgorge all fees received from the Plans, directly or indirectly, and profits thereon, and restore all losses suffered by the Plans caused by their breaches of the duty of loyalty.

## COUNT III

### Prohibited Transaction in Selecting the Plans' Investment

139.     Anderson repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.     As sponsor of the Plans, Principal and its subsidiaries, are parties in interest.

141.     In 2012, Defendants selected a new Principal investment option for the Plans—the Principal Select Savings Stable Value Fund. The only investors in that fund in 2012 were the Plans.

142.     Principal and its affiliates have collected fees from the Plan for managing the Stable Value Fund.

143.     Defendants engaged in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, by causing the Plans to invest in the Stable Value Fund and pay fees to Principal in connection therewith.

## COUNT IV

### Prohibited Transactions and Breaches of Duty in Connection
### with the Plans' Administration

144.     Anderson repeats and realleges each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

145.     As sponsor of the Plans, Principal and its subsidiaries, are parties in interest.

146.     Principal is a fiduciary to the Plans.

147.     Defendants are bound by ERISA's duties of undivided loyalty and defraying Plan

expenses.

148.     ERISA § 408(b)(2) prohibits a fiduciary, here the Defendants, from causing the Plans

to engage in transactions with a  party in interest that involve the furnishing of services to the Plans,

such as the various recordkeeping and plan administration.

149.     Defendants violated their fiduciary duties and engaged in prohibited transactions by

causing the Plans to pay Principal, directly or indirectly, millions of dollars in annual recordkeeping

and administrative fees beyond a reasonable amoint for such services. Each year of the Class Period,

the Plans paid, directly or indirectly, in discrete, periodic transactions, millions of additional dollars

for recordkeeping and administrative fees because Defendants failed to bargain for and seek

revenue-sharing rebates.

150.     Defendants knew or should have known that the Plans could have negotiated far

lower administrative fees, but Defendants caused the Plans to pay, directly or indirectly, millions of

dollars to Principal for Principal's benefit.

151.     As a direct and proximate result of these breaches of duty and prohibited transaction

violations, the Plans paid millions of dollars in additional administrative fees.

152.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plans resulting from the breaches of duty and prohibited transactions and disgorge all revenues received by Principal and its subsidiaries from the fees paid by the Plans to Principal and its subsidiaries, and Plaintiffs are entitled to appropriate equitable relief.

## COUNT V

### Prohibited Transactions and Breaches of Duty in Connection with Separate Account Fees

153.     Anderson repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

154.     As sponsor of the Plans, Principal and its subsidiaries are parties in interest.

155.     The Principal affiliates and subsidiaries that manage and administer the Principal investment options are fiduciaries to the Plans with respect to the Plans' assets in the Principal investment options.

156.     Multiple times each year during the Class Period the Plans paid assets from the Principal investment options to pay such fees.

157.     As a direct and proximate result of these breaches of duty and prohibited transaction violations, the Plans paid high fees and suffered millions of dollars in losses thereby.

158.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all monies taken from the Plans resulting these transactions and disgorge all revenues received by Principal and its subsidiaries from the fees paid by the Plans to Principal and its subsidiaries, and Plaintiffs are entitled to appropriate equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Anderson prays for relief as follows:

1.     A declaration that the Defendants breached their fiduciary duties;

36

2.      A declaration that the Defendants violated ERISA § 406 and participated in prohibited transactions;

3.      An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Principal subsidiaries and affiliates by the Plans, including disgorgement of profits thereon;

4.      An order compelling the Defendants to restore all losses to the Plans arising from Defendants' violations of ERISA;

5.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

6.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plans, the appointment of independent fiduciaries to administer the Plans, and rescission of the Plans' investments in Principal investment options;

7.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plans, and imposing a constructive trust for distribution of those amounts to the extent required by law;

8.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

9.      An order awarding Anderson and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

10.     An order awarding such other and further relief as the Court deems equitable and just.

Dated: April 17, 2015                                   Respectfully submitted,


                                                        /s/ Kay M. Johansen
                                                        The Law Office of Kay Johansen
                                                        504 First Ave. S.E.
                                                        Mount Vernon, IA  52314
                                                        Telephone:  319-895-6540
                                                        Fax:  319-895-6560
                                                        E-mail:  kay.johansen@kjohansenlaw.com


                                                        Gregory Y. Porter
                                                        Bailey & Glasser LLP
                                                        910 17th Street, Suite 800
                                                        Washington, DC 20006
                                                        Tel: 202-463-2101
                                                        gporter@baileyglasser.com


                                                        ATTORNEYS FOR PLAINTIFF